IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Heartland Jockey Club Ltd.,  :
et al.,                      :
        Plaintiffs,           :
    v.                        :   Case No. 2:09-cv-804
Penn National Gaming, Inc.,   :   JUDGE HOLSCHUH
        Defendant.            :


OPINION AND ORDER

I. Introduction

This breach of contract case is before the Court to consider whether discovery should be phased or whether each party should be free to conduct discovery to the extent permitted by F.R.Civ.P. 26(b). The concept of phasing discovery was raised by the defendant in the Rule 26(f) Report filed by the parties, was argued extensively at the initial Rule 16 conference, and has been briefed by the parties. For the following reasons, the Court rejects the proposal to phase discovery.

II. The Proposal to Phase Discovery

A brief explanation of the nature of the case will be helpful. Plaintiffs Heartland Jockey Club Ltd. and Charles J. Ruma (the Court will refer to them collectively as Heartland) own and operate the Beulah Park horse racing track which is located in Grove City, Ohio. In 2006, Heartland signed an option agreement with defendant Penn National Gaming for the sale of Beulah Park under certain conditions. Briefly stated, those conditions relate to whether Heartland would become legally authorized to install and operate a specified number of slot

machines or similar devices at the race track. The agreement was effective for a period of six years. In the amended complaint, Heartland asserts that Penn National has breached the agreement and, as a result, the parties are no longer bound by it. Among other relief, Heartland has asked for a declaration that the agreement is void - relief which would then free Heartland to seek other purchasers for the property.

The parties' disagreement about the proper course of discovery is very much related to the conduct which, in Heartland's view, constitutes Penn National's breach of contract. As Heartland reads the contract, it imposes a duty on Penn National to support any constitutional or legislative changes necessary to allow for slot machines to be operated at Beulah Park. Heartland also asserts that Penn National was under a contractual duty not to do anything which would either delay or materially affect the consummation of the agreement or impair the value of the option. It is safe to say that the parties do not agree on their interpretation of the agreement, and especially on this latter point.

As those who have followed Ohio's most recent general election are aware, the Ohio Constitution has been amended to allow for the construction and operation of four casinos in Ohio, including one in Franklin County. It is common knowledge that Penn National was a supporter and beneficiary of these constitutional changes. As those who have followed the developments concerning the legalization of slot machines in Ohio also know, although Governor Strickland directed the Ohio Lottery Commission to do whatever was necessary to allow for the placement of such devices (also called Video Lottery Terminals) at a number of racetracks around Ohio, and the Ohio General Assembly enacted legislation which would permit that operation, the Ohio Supreme Court has held that the issue is properly the

subject of a referendum vote. State ex rel. LetOhioVote.org v. Brunner, 123 Ohio St. 3d 322 (2009). Heartland believes that Penn National supported the organization, LetOhioVote.org, which litigated this issue. According to Heartland, both of these activities violated Penn National's duties under the option agreement because they made it less likely that the option would be exercised, they impaired the value of the option, or both.

Heartland proposes that, now that the parties have met and conferred as required by Rule 26(f), full discovery should commence. That discovery would necessarily include inquiries about Penn National's lobbying efforts concerning the casino issue as well as whether it directly or indirectly lent support to the effort to block implementation of the video lottery terminal legislation by insisting that such a proposal could take effect only after a statewide referendum was conducted. Penn National has countered with a proposal that the discovery be phased, and that certain discovery should be prohibited altogether until either certain rulings have been made by the Court or certain dates have come and gone without a ruling.

In requesting that discovery be phased, and phased in a very particular way, Penn National relies on two related arguments. First, it contends that the Court can rather quickly dispose of the issue of whether any of the activities which the complaint identifies as contractual breaches - assuming that these activities actually occurred - constituted a breach of contract. In its view, either the contract clearly speaks to what types of actions would violate the provisions of the agreement which Heartland contends were breached, or the Court can take a relatively small amount of extrinsic evidence into account and can make the necessary decision through summary judgment proceedings. The extrinsic evidence to be discovered and presented on this issue would not include any evidence about the

conduct which Penn National may have engaged in, because that would not be relevant to the Court's construction of the contract.  This would not only preserve the Court's and the parties' resources by creating a scenario where, should the Court decide this issue in Penn National's favor, the case can be resolved quickly and without extensive discovery, but it would also prevent Heartland from achieving what, in Penn National's view, is the true objective of this litigation - to pry into, and then make public, Penn National's lobbying activities, as well the actions taken by others, including legislators and members of Governor Strickland's office, to promote the actions of LetOhioVote.org.  This is of particular concern to Penn National, and, in its view, to the integrity of Ohio's legislative process, both because of the intrusiveness of such discovery into the details of that process, and because the process is still ongoing.

Penn National advanced a specific proposal in the Rule 26(f) report which it has modified slightly in its post-conference brief.  Under its proposal, the parties would complete Phase I discovery and file summary judgment motions on the issues of contract interpretation by March 31, 2010.  The scope of that discovery would be limited to "evidence of contract negotiation between the parties."  In all likelihood, no more than six witnesses would be deposed on that issue.  Initially, Penn National had proposed that no additional discovery would be permitted until the Court had made its ruling on the contract interpretation issue.  As Penn National expressed this concept in the Rule 26(f) report, "in the unlikely event that Phase II is necessary after the resolution of Phase I, the remaining issues [i.e. did Penn National actually breach the contract, and, if so, what relief Heartland is entitled to] would be part of Phase II." In response to concerns voiced at the Rule 16 conference about

the fact that there is no way to predict how much time it might take the Court to issue its Phase I ruling, Penn National has now suggested that the Court use what it describes as a "preliminary peek" procedure in which the Court would conduct a preliminary evaluation of the Phase I motion to determine how likely it is that the motion will dispose of the case.  If that is not very likely, the Court could then order the Phase II discovery to proceed immediately.  That way, Penn National would not be able to delay the ultimate resolution of the case unduly simply by filing a dispositive motion which stands little or no chance of being granted.

    In opposing the proposal to stay discovery, Heartland focuses on the question of how its economic interests would be impacted by delay in deciding this case.  Right now, due to the existence of the option agreement, Heartland may not attempt to sell Beulah Park to anyone but Penn National.  Because of the possibility that slot machines may be installed at Beulah Park, there may well be other parties interested in paying a substantial sum of money for the property.  Under Penn National's discovery proposal, at least as it was initially made, it may well be years before the Court decides whether or not Heartland was entitled to treat the option agreement as having been properly terminated on August 24, 2009 (the date on which Heartland sent a letter to Penn National asserting that due to Penn National's material breaches, the agreement terminated).  Heartland believes it likely that the Phase I proceedings could stretch out for six months to a year after Penn National moves for summary judgment.  After that decision is made, the parties would have to do extensive discovery on the Phase II issues, after which there would be more motions practice and, ultimately, a trial (and then an appeal).  Consequently, it might well be the case that the agreement would expire on its own terms before

Heartland found out if it had the right to terminate it three years before. In that event, Rule 57's provision that the Court may order a speedy hearing on a declaratory judgment action would be thwarted and Heartland's economic interests would be severely and adversely affected. These factors, according to Heartland, when coupled with the courts' typical reluctance to stay discovery until the resolution of a case-dispositive motion, counsel strongly against the phasing of discovery that Penn National has proposed.

III. <u>Analysis of the Issue</u>

Penn National relies heavily upon Judge Posner's decision in <u>Marrese v. American Academy of Orthopaedic Surgeons</u>, 706 F.2d 1488 (7th Cir. 1983), <u>vacated</u> 726 F.2d 1150 (7th Cir. 1984)(en banc), <u>rev'd on other grounds</u> 470 U.S. 373 (1985), in support of two propositions - first, that the Court must balance (and weigh more heavily) societal interests against purely private interests in determining whether certain discovery should be allowed, and, second, that the Court has substantially more discretion to order a postponement of discovery than a complete stay of all discovery. As the Court of Appeals (again speaking through Judge Posner) stated in the panel opinion found at 726 F.2d 1150,

> A motion under Rule 26(c) to limit discovery requires the district judge to compare the hardship to the party against whom discovery is sought, if discovery is allowed, with the hardship to the party seeking discovery if discovery is denied. [The judge] must consider the nature of the hardship as well as its magnitude and thus give more weight to interests that have a distinctively social value than to purely private interests; and [the judge] must consider the possibility of reconciling the competing interests through a carefully crafted protective order. [The judge] must go through the same analysis under Rule 26(d) except that an order merely postponing a particular discovery request obviously should be granted more freely than one denying the request

altogether.

Marrese, 726 F.2d at 1159.  The court also observed that phasing discovery in order to allow the parties to conduct non-sensitive discovery first, if that discovery would be pertinent to a case-dispositive motion, might be a way to safeguard whatever societal interests were implicated by otherwise allowing discovery to proceed apace.  Citing Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 597 (1st Cir. 1980), the court stated that this was one way to insure that the filing of the action was not just a pretense for engaging in sensitive or burdensome discovery when the action itself bordered on the frivolous.

This Court takes seriously its obligation to manage discovery and recognizes that there are cases where the plaintiff's claim is so tenuous, and the potential injury to either private or societal interests from unfettered discovery is so great, that the Court must limit or preclude discovery in order to strike the proper balance between the competing interests involved.  The Court also recognizes, however, and has consistently held in the past, that the Federal Rules of Civil Procedure do not provide (and have never provided) for an automatic stay of discovery during the pendency of any type of case-dispositive motion, nor is the pendency of such a motion explicitly cited as a factor to be considered under those rules which mandate the performance of a cost-benefit analysis when one party objects to discovery as being unduly burdensome or disproportionate to the matters at stake in the litigation.  See, e.g., Fed.R.Civ.P. 26(b)(2)(C) (listing as factors to be considered in such an analysis whether "the discovery sought is unreasonably cumulative or duplicative" and whether "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in

-7-

controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues"). The Court also notes that when the interests of non-parties to the litigation are implicated by discovery, it has broad discretion to protect them from incurring undue burden and expense, see Fed.R.Civ.P. 45(c), and it also must respect and protect societal interests by recognizing and enforcing privileges or other doctrines that shield various types of information from disclosure, or from disclosure to persons other than those directly involved in the litigation. See,e.g., Fed.R.Civ.P. 26(c). Taking these various factors into account here, Penn National's request that discovery be separated into that which relates to interpretation of the contract and that which relates to all other issues in the case, and that only the former discovery be permitted in the near term, raises the following questions:

(1) Is this a case where the proposed "sneak peek" at the summary judgment motion which Penn National intends to file would be of some help to the Court in determining if it is, in this Court's words, see DiYanni v. Walnut Tp. Bd. of Ed., 2006 WL 2861018, *2 (S.D. Ohio October 4, 2006), "patent that the case lacks merit and will almost certainly be dismissed ..."?

(2) If the various societal and private interests are given appropriate weight, do the societal interests identified by Penn National so strongly favor a stay of discovery that, coupled with the parties' and the Court's usual interests in avoiding unnecessary expense and delay, the Court should phase discovery as proposed by Penn National?

(3) And, finally, what might be the consequences of the Court's decision on the Phase I issue from precluding any discovery about exactly what Penn National may have done, particularly with respect to its alleged support of

controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues"). The Court also notes that when the interests of non-parties to the litigation are implicated by discovery, it has broad discretion to protect them from incurring undue burden and expense, see Fed.R.Civ.P. 45(c), and it also must respect and protect societal interests by recognizing and enforcing privileges or other doctrines that shield various types of information from disclosure, or from disclosure to persons other than those directly involved in the litigation. See,e.g., Fed.R.Civ.P. 26(c). Taking these various factors into account here, Penn National's request that discovery be separated into that which relates to interpretation of the contract and that which relates to all other issues in the case, and that only the former discovery be permitted in the near term, raises the following questions:

(1) Is this a case where the proposed "sneak peek" at the summary judgment motion which Penn National intends to file would be of some help to the Court in determining if it is, in this Court's words, see DiYanni v. Walnut Tp. Bd. of Ed., 2006 WL 2861018, *2 (S.D. Ohio October 4, 2006), "patent that the case lacks merit and will almost certainly be dismissed ..."?

(2) If the various societal and private interests are given appropriate weight, do the societal interests identified by Penn National so strongly favor a stay of discovery that, coupled with the parties' and the Court's usual interests in avoiding unnecessary expense and delay, the Court should phase discovery as proposed by Penn National?

(3) And, finally, what might be the consequences of the Court's decision on the Phase I issue from precluding any discovery about exactly what Penn National may have done, particularly with respect to its alleged support of

LetOhioVote.org?

### A. The First Issue: Sneak Peek?

Parties moving for a stay or postponement of discovery pending resolution of a dispositive motion have sometimes filed that motion when the stay is requested, and sometimes have not. It is generally easier to determine if the motion is almost certainly going to be granted by looking at the motion itself, but in many cases there is enough information in the pleadings and, in a contract case, the contract itself to determine whether the plaintiff has little or no chance of prevailing. Certainly, the Court does not have the benefit of whatever evidence will be adduced concerning the parties' contract negotiations, but that is never the starting point for contractual interpretation, and often does little or nothing to aid the Court in determining the meaning of the disputed contractual terms. The Court has a good understanding of where the dispute lies here and what each party will argue, and has little difficulty determining that this case does not represent any type of fishing expedition or sham litigation designed solely or primarily to permit Heartland to delve into Penn National's private matters or to use the prospect of expensive discovery in order to force Penn National into an unfavorable settlement. Heartland has a substantial economic incentive for pursuing its claim for termination of the contract which is unrelated to any potential embarrassment its discovery requests may cause to Penn National.

The Court further concludes that Heartland also has, at the very least, a good faith argument that, if Penn National is truly involved in backing LetOhioVote.org, contractual duties were breached. Further, the summary judgment motion which Penn National would file after Phase I discovery is completed would not be asking the Court to decide if any specific conduct about the referendum initiative breached the contract. Unlike its

backing of the casino issue (Issue 3), Penn National does not admit to any activities relating to the referendum initiative, and under its proposal Heartland would be prohibited from discovering whether Penn National engaged in any such activities. Its argument on this issue would have to be limited to asserting that the contractual provisions at issue cannot be construed to create any duty at all on its part not to engage in activity which had the ultimate effect of delaying the implementation of the Governor's slot machine proposal. It seems, other things being equal, that it is less likely to prevail on such a sweeping argument than on some more specific argument that even though it may have done something to support the referendum initiative, that specific activity either was not prohibited by the contract or did not cause whatever delays have occurred, thus making any breach immaterial. Given the type and scope of argument Penn National would necessarily be presenting as part of its proposed Phase I proceedings, the Court cannot conclude that it is patently obvious that Heartland's position on this issue will be summarily rejected. Thus, this aspect of the issue can fairly be evaluated without the need to wait an additional three months for the summary judgment motion to be filed. This factor weighs against Penn National's request.

      B.   <u>The Second Issue: Weighing the Interests</u>

Answering the second question requires the Court to identify what interests are furthered or threatened by allowing Heartland to pursue its discovery now rather than later. The Court will take into account, in this analysis, the fact that there is a fair likelihood that the objected-to discovery will take place in the future based on the fact that it is not a foregone conclusion that the case will be resolved by way of an early summary judgment motion. Further, as explained above, dividing up the discovery as Penn National has proposed may actually prevent the

Court from making a ruling, in the context of an early summary judgment motion, as to whether any support Penn National may have lent to the referendum issue actually breached the parties' agreement.

The private interests are easy to identify.  Penn National asserts the typical defendant's interest in avoiding the time and expense of engaging in discovery that may prove to be unnecessary to the resolution of the case.  Heartland would certainly benefit to some extent if it were not required to conduct that discovery, but its interest clearly lies in having the entirety of the case resolved sooner rather than later.  That is particularly true where, as here, its ability to sell or otherwise dispose of a piece of real property and a fairly unique business, which finds itself, by virtue of the slot machine proposal, in fairly unique circumstances, is impeded by the uncertainty about whether the option agreement is still in effect.  It is difficult to say that either parties' interest is more significant, and if these interests essentially offset each other, there would seem to be no reason to deviate from the usual course of allowing discovery to proceed in accordance with the Federal Rules of Civil Procedure.

The public or societal interests are somewhat more difficult to evaluate.  Penn National asserts that because one of the alleged contractual breaches relates to the activities of LetOhioVote.org and the referendum issue, allowing Heartland to conduct discovery in this area would "taint the political process."  Penn National also argues that the discovery will be very burdensome and that there is a public interest in not saddling public officials or other non-parties with the effort it will take to respond to that discovery.  Some of the same concerns may be present with respect to discovery directed to Penn National's support of Issue 3, but because that support is

not likely to be in dispute, there is less of a potential for extensive or intrusive discovery directed toward that conduct, and the Court will focus its analysis on the referendum issue.

The Marrese court considered a somewhat similar issue because the defendant in that case asserted a First Amendment interest in maintaining the confidentiality of its membership list. The court observed that disclosure of that list might inhibit the free flow of information among the members of the organization and could affect the members' willingness to express candid opinions about other applications for membership. Because the membership list was kept confidential and the exchange of ideas among those members was not expected to take place in a public forum, there were First Amendment interests implicated if the plaintiffs were allowed to conduct discovery on those issues. It was also important to the court's decision that plaintiffs would suffer no prejudice from being denied that information at the early stages of the case because the information appeared unlikely to help plaintiffs establish the foundational elements of their antitrust claim.

The Court is not persuaded that the public interest would be served by keeping private the relationship, if any, between Penn National and LetOhioVote.org. First, there have been public filings in the Ohio Supreme Court alleging a relationship, there have been newspaper articles printed about it, and both Penn National and LetOhioVote.org have issued public statements about allegations that Penn National indirectly supported the referendum issue. See, e.g., "Pa. gaming firm financing Ohio anti-slots group, document says," *The Charleston Gazette*, September 1, 2009 (available on the internet at http://www.wvgazette.com/News/Business /200909010877). In its public statement, Penn National has threatened litigation against those who have suggested it supported LetOhioVote.org, a course

of action which would certainly implicate many of the same interests Penn National is attempting to protect in this case. Additionally, although there are some First Amendment concerns raised by the disclosure of information relating to persons who, through organizations, attempt to influence elections or issues, the Supreme Court has recognized the constitutionality of legislation that requires significant disclosures of the names of contributors to such organizations. At the same time, it has downplayed the potential infringement of those contributors' First Amendment rights from fear of government reprisal. See, e.g., McConnell v. Federal Election Comm'n, 540 U.S. 93 (2003); Buckley v. Valeo, 424 U.S. 1 (1976). Those decisions also recognize that important public interests are served by disclosing that information, such as reducing the opportunities for corruption to seep into the electoral process. Thus, it is by no means clear that the public interest in this case is served only by keeping information about LetOhioVote.org and its potential relationship with Penn National out of the public arena. Quite the opposite may be true. In short, the Court is not convinced that by allowing Heartland to discover some information about how LetOhioVote.org was created and funded, the public's interest in the integrity of the legislative process will somehow be undermined.

The Court recognizes that, apart from any First Amendment concerns, some of the proposed discovery may either require non-parties to participate in the discovery process, or may impinge upon interests that are protected by various privileges. Those things are true in many cases. Again, the Federal Rules of Civil Procedure, and particularly Rules 26 and 45, give the Court tools to address any undue burdens created by discovery directed to non-parties and to recognize and enforce any privileges. Those factors, by themselves, are not the type of public or societal

interests that weigh heavily in favor of a stay or postponement of discovery.

    C. <u>The Third Issue: Consequences of Phasing Discovery</u>

One of the major untoward consequences which would almost certainly result from phasing discovery in the way that Penn National has proposed would be to delay both the Court's ability to resolve Heartland's request for declaratory relief and to resolve the entire case. A case that involves fairly discrete issues about whether one party breached a contract, if the breach was material, and if the other party is entitled either to treat the contract as a nullity or to damages, should not take an inordinately long time to resolve. Fed.R.Civ.P. 1 encourages the Court to strive to resolve cases in a just, speedy and inexpensive manner. It has been the Court's experience that delay leads to expense, even in a case where the delay occurs as a result of efforts to avoid unnecessary expense. Again, since it is not a foregone conclusion that the case would end after the Phase I proceedings were completed, the stay of discovery proposed by Penn National does create a very real possibility of not only increased time to resolve the case, but increased expense to both parties.

                    IV. <u>Conclusion</u>

For the foregoing reasons, the Court denies Penn National's request to phase discovery in this case. The Court sets the following schedule in this case:

    1. Any motion to amend the pleadings or add parties shall be filed by January 8, 2010;

    2. Any party who will use an expert witness in support of an issue on which that party has the burden of proof shall identify the expert, and provide all materials required by Fed.R.Civ.P. 26(a)(2), by April 30, 2010. Responsive experts shall be identified in the same fashion by May 31, 2010.

3.  All discovery shall be completed by June 30, 2010.

4.  Any summary judgment motions shall be filed no later than July 31, 2010.  This does not preclude the earlier filing of a dispositive motion on any issue about which discovery has been completed.

5.  The parties shall make a good faith effort to settle this case, and shall advise the Court if its participation in the settlement process would be productive.

                                    /s/ Terence P. Kemp
                                    United States Magistrate Judge